IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ROBIN J. DIGGS,                              :
    Plaintiff,                           :
                                         :
    v.                                   :      **CIVIL ACTION NO. 24-CV-4827**
                                         :
BUCKS COUNTY, *et al.*,                      :
    Defendants.                          :

**MEMORANDUM**

**SCHMEHL, J.** */s/ JLS*                                              **MAY 13, 2026**

*Pro se* Plaintiff Robin J. Diggs, an inmate currently confined at SCI Chester, asserts claims

under 42 U.S.C. § 1983 and state law against Bucks County ("the County"), several County

employees, PrimeCare Medical, Inc. ("PrimeCare"), and three PrimeCare nurses. (*See* ECF No.

29.) Currently before the Court are two motions to dismiss Plaintiff's Amended Complaint for

failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

The first is a Motion and Supporting Memorandum (ECF Nos. 44, 44-1) filed by

Defendants Bucks County, Captain Nottingham, James Coyne, David Kratz, Robert McLeod, Carl

Metellus, Daniel Onisick, and Kelly Reed (collectively, the "County Defendants"). Diggs filed a

response in opposition (ECF No. 65), the County Defendants filed a reply in further support of

their Motion (ECF No. 67), and Diggs filed a surreply (ECF No. 70). The second is a Motion and

Supporting Memorandum filed by PrimeCare (ECF Nos. 49, 49-1). Diggs filed a response in

opposition (ECF No. 58), PrimeCare filed a reply in further support of its Motion (ECF No. 59),

and Diggs filed a surreply (ECF No. 66). Also pending are Diggs's three Motions for Appointment

of Counsel (ECF Nos. 43, 62, 68). For the reasons that follow, PrimeCare's Motion to Dismiss

will be granted in full, the County Defendants' Motion to Dismiss will be granted in part and denied in part, and Diggs's Motions for Appointment of Counsel will be granted.

## I.    PROCEDURAL HISTORY

Diggs filed this action in September 2024.  (ECF No. 1.)  On February 18, 2025, the Court screened Diggs's Complaint pursuant to 28 U.S.C. § 1915 and dismissed it with leave to amend. (ECF Nos. 19, 20.)  On May 21, 2025, Diggs filed an Amended Complaint, and the Court directed service of the Amended Complaint.[1]  (ECF Nos. 29, 30.)  The motions to dismiss followed.  The County Defendants and PrimeCare move to dismiss the Amended Complaint under Federal Rule of Civil Procedure 12(b)(6).  (*See* ECF Nos. 44 and 49.)

## II.    FACTUAL ALLEGATIONS[2]

Taking the allegations in the Amended Complaint as true, the relevant facts are as follows. On January 12, 2023, Diggs was arrested on a probation violation and detained at the Bucks County Correctional Facility ("BCCF").  (Am. Compl. ¶ 1.)  According to the exhibits attached to the Complaint, Diggs smuggled various drugs into BCCF undetected and sold them to at least two other inmates over the next few days.  (*Id*. at 61.)  On January 16, 2023, at around 8:00 a.m., Diggs's cellmate, Octavious Davis, was found dead from an overdose of fentanyl.[3]  (*Id*. ¶ 2.)

---

[1] The Summonses issued to Defendants Cantino, Naftulin, Cancel, Williams, Hernandez, and Hickmon were returned unexecuted on August 26, 2025.  (ECF No. 41.)  To date, these Defendants and the many Doe Defendants have not been served with the Amended Complaint.

[2] The facts are taken from the Amended Complaint.  (ECF No. 29.)  The Court adopts the sequential pagination supplied by the CM/ECF docketing system.  Additionally, the Court includes facts reflected in publicly available state court records, of which this Court may take judicial notice. *See Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006).  Where the Court quotes from the Amended Complaint, punctuation, spelling, and capitalization errors will be cleaned up as needed.

Diggs, "without making sure to securely wrap numerous drug filled balloons containing fentanyl and several other drugs that he possessed, ingested [the drugs] right before" being removed from the cell by BCCF correctional officers. (*Id*. ¶ 3.) Diggs was given a urine test, which came back positive for fentanyl, methamphetamine, barbiturates, amphetamines, and marijuana. (*Id*. ¶ 4.) He was placed in a Restricted Housing Unit ("RHU") cell and charged with a disciplinary violation for intoxication. (*Id*.)

Later that morning, Diggs was interviewed by Defendant Robert McLeod, a BCCF investigator. (*Id*. ¶ 5.) Diggs initially denied using any drugs but told McLeod he wasn't feeling well and wanted to see the medical staff. (*Id*. ¶¶ 6-7.) Diggs eventually admitted to being under the influence of fentanyl and other drugs and reiterated that he wanted to see the medical staff. (*Id*. ¶ 7.) McLeod commented that "using drugs will have a bad effect on your health and that you could die from fentanyl[,]" but refused Diggs's request and continued to question him about the origin of the drugs. (*Id*. ¶¶ 8-9.) Diggs explained that he was suffering from withdrawal and reiterated his need for medical attention. (*Id*. ¶ 10.) McLeod "told [Diggs] that he can clearly see how he was under the influence and that he looked like he was ready to pass out." (*Id*.) He told Diggs that until he was willing to divulge what drugs he had taken and any he had hidden in his body, he would be held and monitored in an RHU cell. (*Id*.) Diggs was returned to the RHU cell and "was never taken to be evaluated by medical nor [were] any x-rays performed to determine if [Diggs] in fact had drugs within his body, and how much." (*Id*. ¶ 11.) Under BCCF's contraband policy, which Diggs refers to as the "contraband potty watch" policy, he was placed in a cell with no running water, under 24-hour monitoring, was denied showers, drinking water and recreation,

---

[3] Diggs was later charged with drug delivery resulting in death based on this incident and pled guilty in the Bucks County Court of Common Pleas. *See Commonwealth v. Diggs*, CP-09-CR-0003022-2023 (C.P. Bucks). He was sentenced to 7 to 25 years. *Id.*

and was not provided any medical treatment. (*Id.* ¶ 12.) He asserts that the policy permits placement of an inmate under "potty watch" for no more than 72 hours. (*Id.*)

During the evening of January 16, 2023, Diggs was initially monitored by BCCF Correctional Officer John Doe #1. (*Id.* ¶ 13.) Diggs told Officer John Doe #1 he was experiencing "serious pain in his abdominal area" and asked to be seen by medical personnel. (*Id.*) Officer John Doe #1 told Diggs he was under instructions by his Sergeant not to call medical unless Diggs was "ready to give up whatever was inside of his body." (*Id.*)

In the early morning hours of January 17, 2023, Diggs was taken from his cell to the BCCF Investigation Office where he was questioned by two BCCF investigators (Defendants McLeod and Onisick) and two detectives from the Bucks County District Attorney's Office (Defendants Gorman and Naftulin). (*Id.* ¶ 14.) Diggs told the four Defendants he was still feeling sick and that his pain had become "more excruciating." (*Id.* ¶ 15.) Defendant McLeod told Diggs that he would have to answer some questions before they would consider sending him to the medical ward. (*Id.* ¶ 17.) Diggs ultimately confessed that he had hidden various drugs in his body, including fentanyl and K2, and pleaded for medical attention, fearing that the drugs would burst in his body and kill him. (*Id.* ¶¶ 21-25.) Diggs was asked if he was willing to make a bowel movement to give up the drugs and he stated that he was. (*Id.* ¶ 27.) McLeod commented that Diggs "had to know that he could die by putting drugs, especially fentanyl, in his body." (*Id.* ¶ 29.) Diggs was taken back to his RHU cell where he made a bowel movement that produced a large quantity of drugs. (*Id.* ¶ 30.) Sgt. John Doe #1 took possession of the drugs, but despite knowing that Diggs had more drugs in his body and was in severe pain, declined to order that Diggs be provided medical care. (*Id.*)

4

Later on January 17, 2023, Diggs was monitored by Officer Cancel.  (*Id*. ¶ 32.)  Diggs states that Cancel "[knew] that he was in pain and had more harmful substances inside of his body" but refused Diggs's request for medical treatment, stating that his Sergeant directed him only to monitor Diggs and not call medical.  (*Id*.)  Officer Williams was in charge of the RHU during the 6:00 a.m. to 2:00 p.m. shift while Diggs was held there between January 17 and January 19, 2023.  (*Id*. ¶ 33.)  Over the course of three days, Diggs "yelled out to Officer Williams several times" asking him to call for medical assistance.  (*Id*. ¶¶ 33-34.)  Williams "repeatedly laughed" at Diggs and called him "stupid."  (*Id*. ¶ 33.)  He also commented at one point:

> [T]he whole medical department, administration and every officer in and out of this Unit knows that you got drugs in your body and that you could die from them like your bunkie.  The nurse comes over here from one to two . . . they know you should be taken to the hospital.  It's obvious that nobody cares about your life.  You bring drugs into the jail and now that your boy is dead, so you're getting what you deserve.  And unless my supervisor tells me otherwise, or you fall out dead, ain't nothing I can do to help you.

(*Id*. ¶ 34.)  Diggs similarly informed Defendants John Does #3, #4, #5, and #6 over the course of the next two days that he was in pain, had dangerous drugs in his body that could burst at any moment, and that he needed medical attention.  (*Id*. ¶¶ 36-38.)  They all refused to call medical staff for him or take him for medical care.  (*Id*.)  Between January 17 and January 19, 2023, three PrimeCare nurses (whom Diggs refers to as PrimeCare Nurses Jane Doe #1, #2, and #3) came to administer medication to other RHU inmates.  (*Id*. ¶¶ 47-49.)  Despite being made aware in an administrative briefing that Diggs had ingested fentanyl, and despite Diggs telling each of them that he was in pain and pleading for medical care, the three nurses refused to perform any medical examination or provide him medical treatment.  (*Id*.)  Nurse Jane Doe #1 commented to the officer on duty at the time that "if [Diggs] is not dead yet, it is presumed that he is alright."  (*Id*. ¶ 47.)

She also "refused to even assess [Diggs's] condition" despite being made aware that he had ingested fentanyl. (*Id*.)

Diggs further asserts that over the course of his detention in the RHU cell, he was

> . . . made to live in foul and inhumane conditions which consisted of being denied drinking water for four days and [being denied] medical attention. [He] was forced to endure the stench of urine and feces that had piled up in and around the toilet over a four-day period, because [he] was unable to flush the toilet. [Diggs] had freezing cold air blowing on him in the cell, poor ventilation, a soiled mattress to sleep on, and one dirty used mildewed and pissy smelling blanket. No sheets or pillows, constant illumination from cell lights being on 24 hours a day, in a terribly filthy cell with feces smeared on the walls . . . no showers or hygiene products . . . all while experiencing pain from the drug (heroin, fentanyl) withdrawal and lethal drug-filled packages inside of [his] body[.]

(*Id*. ¶ 39.) He also alleges that between January 16, 2023 and January 20, 2023, Defendants Hernandez, Officer John Doe #7, and Sgt. John Doe #7 "used excessive force to physically and verbally assault and abuse [him]" in his cell. (*Id*. at 31.) He attaches an affidavit from a fellow BCCF inmate, David McCloskey, who avers that he was held in the RHU cell next to Diggs during the relevant time and witnessed the alleged abuse by Officer Hernandez, an unnamed lieutenant or sergeant, and possibly another officer. (*Id*. at 70.) McCloskey states, *inter alia*:

> when Mr. Diggs was in the RHU in the cell next to me, I witnessed the officers run into the cell Mr. Diggs was in and I seen them assault him badly. I heard Mr. Diggs yelling and screaming and he was yelling "my arm[!]" then he started to cry. I heard numerous loud slams as if they were slamming him around and punching him.

(*Id*.)

On January 20, 2023, Officer Hickmon was charged with monitoring Diggs in the RHU cell. (*Id*. ¶ 39.) Diggs "begged [him] to call medical and ask[ed] them to transport him to the hospital. [Diggs] informed Officer Hickmon that he knows the packages busted inside of his body and he felt surges of pain in his abdomen." (*Id*. ¶¶ 39-40.) Nevertheless, Hickmon refused to call

6

for medical assistance. (*Id*. ¶ 40.) Around 1:00 p.m. the same day, Diggs was "standing at the door of [his] cell . . . having an exchange of words with Defendant Hickmon, informing him that he desperately needed medical assistance." (*Id*. ¶ 41.) Diggs began experiencing "blurred vision, mental distortion and body pain." (*Id*.) He sat on the bed and passed out from an overdose. (*Id*.) Officer Hickmon called a medical code, and unspecified PrimeCare nurses came and administered two doses of Narcan, which Diggs alleges "did absolutely nothing to help revive [him]."[4] (*Id*. ¶ 42.) He was then transported to Doylestown Hospital, where he was kept unconscious in the Intensive Care Unit on life support for three days until doctors received medical authorization from Diggs's fiancée to operate on him, and removed the drug balloons from his body.[5] (*Id*. ¶¶ 42-44; *id*. at 71-72.)

Diggs alleges he "endured a damaged brain, body and memory" and that he continues to suffer long and short-term memory loss along with post-traumatic stress disorder and depression. (*Id*. at 57.) Diggs seeks monetary damages and a declaratory judgment stating that the Defendants have violated his rights.[6]

---

[4] To allege facts concerning events that occurred while he was unconscious or in a coma, Diggs explains that he relied on the witness testimony of fellow inmates who were present. (Am. Compl. ¶ 45.)

[5] Medical records from Doylestown Hospital, which Diggs attached to the Amended Complaint, reflect that on January 23, 2023, a surgeon operated on Diggs and removed two balloons of drugs intact from his stomach and one intact from his rectum. (Am. Compl. at 71-72.)

[6] Declaratory relief is unavailable to adjudicate past conduct, so Diggs's request for this declaratory relief is improper. *See Corliss v. O'Brien*, 200 F. App'x 80, 84 (3d Cir. 2006) (*per curiam*) ("Declaratory judgment is inappropriate solely to adjudicate past conduct" and is also not "meant simply to proclaim that one party is liable to another."); *see also Andela v. Admin. Office of U.S. Courts*, 569 F. App'x 80, 83 (3d Cir. 2014) (*per curiam*) ("Declaratory judgments are meant to define the legal rights and obligations of the parties in the anticipation of some future conduct."). A declaratory judgment is also not "meant simply to proclaim that one party is liable to another." *Corliss*, 200 F. App'x at 84 (*per curiam*); *see also Taggart v. Saltz*, No. 20-3574, 2021 WL 1191628, at *2 (3d Cir. Mar. 30, 2021) (*per curiam*) ("A declaratory judgment is

III.    STANDARD OF REVIEW

"A 12(b)(6) motion tests the sufficiency of the allegations contained in the complaint." *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). In deciding a motion to dismiss under Rule 12(b)(6), the Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555.) "Although the plausibility standard does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations omitted). It is the defendants' burden to show that a complaint fails to state a claim. *See Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (explaining that on a Rule 12(b)(6) motion to dismiss, the "defendant bears the burden of showing that no claim has been presented").

In resolving a Rule 12(b)(6) motion, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). To determine whether a complaint filed by a *pro* se litigant states a claim, a court must accept the facts alleged as true, draw all reasonable inferences in favor of the plaintiff,

---

available to define the legal rights of the parties, not to adjudicate past conduct where there is no threat of continuing harm.").

and "ask only whether that complaint, liberally construed contains facts sufficient to state a plausible . . . claim." *Shorter v. United States*, 12 F.4th 366, 374 (3d Cir. 2021) (cleaned up), *abrogation on other grounds recognized by Fisher v. Hollingsworth*, 115 F.4th 197, 204 (3d Cir. 2024); *see also Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021) (*pro se* filings are construed liberally). Additionally, since Diggs is proceeding *in forma pauperis*, the Court may independently screen his Amended Complaint and dismiss it "at any time" pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) if, among other things, it fails to state a claim. *Brown v. Sage*, 941 F.3d 655, 662 (3d Cir. 2019) (*en banc*) ("To repeat, the statute requires a court to dismiss an IFP complaint 'at any time' if it determines that the complaint is frivolous, malicious, or fails to state a claim.").

## IV.   DISCUSSION

### A.   Federal Claims

The vehicle by which federal constitutional claims may be brought in federal court is 42 U.S.C. § 1983. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). The personal involvement of each defendant in the alleged constitutional violation is a required element, meaning a plaintiff must allege how each defendant was involved in the events and occurrences giving rise to the claims brought against that defendant. *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988).

### 1.   Lack of Personal Involvement

Though not addressed in the Defendants' Motions, Diggs asserts claims against several Defendants who are not alleged to have been involved in the events giving rise to his claims. This includes Warden Carl Metellus, Deputy Warden Jeff Cantino, Deputy Warden Kelly Reed,

Assistant Director James Coyne, and Captain Nottingham, who are either not discussed, or only mentioned in passing in the Amended Complaint. "A defendant in a civil rights action must have personal involvement in the alleged wrongs" to be liable. *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988); *see also Jutrowski v. Township of Riverdale*, 904 F.3d 280, 290 (3d Cir. 2018) ("Each Government official, his or her title notwithstanding, is only liable for his or her *own* misconduct." (quoting *Iqbal*, 556 U.S. at 677)); *Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020) ("Personal involvement requires particular 'allegations of personal direction or of actual knowledge and acquiescence.'" (quoting *Rode*, 845 F.2d at 1207)).

Diggs notes in the "Exhaustion of Administrative Remedies" section of the form complaint he used that Defendant Reed reviewed his initial grievance and that he appealed her denial of his grievance to Defendant Metellus, but received no response. (Am. Compl. at 7.) Participation in the grievance process does not, without more, establish involvement in an underlying constitutional violation. *See Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020) (holding that attaching documents to grievance form is insufficient under *Rode* to show personal direction or actual knowledge by recipient of underlying facts); *Curtis v. Wetzel*, 763 F. App'x 259, 263 (3d Cir. 2019) (*per curiam*) ("The District Court properly determined that Defendants Wenerowicz, Lewis, and Shaylor—who participated only in the denial of Curtis' grievances—lacked the requisite personal involvement [in the conduct at issue]."); *Folk v. Prime Care Med.*, 741 F. App'x 47, 51 (3d Cir. 2018) (*per curiam*) ("Although some of these defendants were apparently involved in responding to some of Folk's prison grievances, there are no allegations linking them to the underlying incidents and thus no basis for liability based on those later grievance reviews."). Thus, these allegations against Reed and Metellus do not state a plausible claim. The other supervisory

10

Defendants are not mentioned at all in the Amended Complaint.[7] Diggs therefore fails to allege the personal involvement of these supervisory Defendants in the violation of his rights and they will be dismissed from this action.

### 2.    Claims Against BCCF

Diggs lists BCCF as a Defendant. The § 1983 claim against BCCF is dismissed as frivolous because a jail is not a "person" under Section 1983. *Cephas v. George W. Hill Corr. Facility*, No. 09-6014, 2010 WL 2854149, at *1 (E.D. Pa. July 20, 2010); *Miller v. Curran-Fromhold Corr. Facility*, No. 13-7680, 2014 WL 4055846, at *2 (E.D. Pa. Aug. 13, 2014) (citing *Mitchell v. Chester Cnty. Farms Prison*, 426 F. Supp. 271 (E.D. Pa. 1976)).

### 3.    Claims Against Defendants Naftulin and Gorman

In the prior Memorandum, the Court explained to Diggs that because Defendants Naftulin and Gorman[8] are employees of the Bucks County District Attorney's Office rather than BCCF, they were not responsible for his medical care or the conditions of his confinement while in BCCF custody. *See Diggs*, 2025 WL 540013, at *7 (citing cases). Accordingly, the Court dismissed the constitutional claims against those Defendants. *Id.* Nevertheless, Diggs realleges those claims

---

[7] Moreover, to the extent that Diggs seeks to attribute liability to these Defendants based on their supervisory roles, generalized allegations that a supervisory defendant is "in charge of" or "responsible for" an office or facility are insufficient to allege personal involvement in an underlying constitutional violation. *See Saisi v. Murray*, 822 F. App'x 47, 48 (3d Cir. 2020) (*per curiam*) ("Saisi asserted that some defendants were 'in charge of agencies that allowed this to happen,' and that liability stemmed merely from defendants' 'belief' that their conduct would be 'tolerated.' However, a director cannot be held liable 'simply because of his position as the head of the [agency].'" (quoting *Evancho v. Fisher*, 423 F.3d 347, 354 (3d Cir. 2005)). Also, liability under § 1983 cannot be predicated on a *respondeat superior* basis. *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 227 (3d Cir. 2015); *Robinson v. Delbalso*, No. 22-2378, 2022 WL 17248100, at *2 (3d Cir. Nov. 28, 2022) (*per curiam*).

[8] The prior Memorandum incorrectly referred to Defendant Onisick, rather than Defendant Gorman, as an employee of the Bucks County District Attorney's Office.

11

against Naftulin and Gorman in the Amended Complaint.  For the same reasons set forth in the Court's prior Memorandum, the claims against Defendants Naftulin and Gorman are again dismissed.

### 4.     Deliberate Indifference to Serious Medical Needs Claims[9]

Diggs alleges that each of the individual Defendants violated his Fourteenth Amendment right to adequate medical care.[10]  To state a Fourteenth Amendment claim based on the failure to provide medical care, a pretrial detainee must allege facts indicating that prison officials were deliberately indifferent to his serious medical needs.  *See Farmer v. Brennan*, 511 U.S. 825, 835 (1994); *Moore v. Luffey*, 767 F. App'x 335, 340 n.2 (3d Cir. 2019) (holding that the standard under the Eighth Amendment and Fourteenth Amendment for claims related to a prisoner's medical needs is essentially the same for purposes of the analysis).  A prison official is not deliberately indifferent "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial

---

[9] Several of Diggs's claims are based on the Eighth Amendment's prohibition on cruel and unusual punishment.  Whether claims asserted by an individual arrested for a parole or probation violation should be analyzed under the Eighth Amendment or the Fourteenth Amendment's due process clause is not a settled matter in the federal courts.  *See Brown v. Harris,* 240 F.3d 383, 388 (4th Cir. 2001) (noting the "uncertainty about whether [a detainee awaiting a hearing on a probation violation] was a pretrial detainee or a convicted prisoner"); *Palmer v. Marion County*, 327 F.3d 588, 593 (7th Cir. 2003) (declining to decide whether a deliberate indifference claim asserted by a plaintiff who was arrested on a probation violation should be analyzed under the Eighth or Fourteenth Amendment, but noting that the same standard applies under both)*; Barnes v. Erie County Prison Admin.*, No. 19-329, 2020 WL 4450297 (W.D. Pa. Aug. 3, 2020) (declining to decide whether the Eighth or Fourteenth Amendment applied to plaintiff's claims, but construing his claims under the more lenient Fourteenth Amendment standard "out of an abundance of caution").  As in *Barnes*, the Court will analyze Diggs's relevant claims under the Fourteenth Amendment out of an abundance of caution; in any event, as discussed below, the relevant claims are plausible under either standard.

[10] Diggs sets forth his deliberate medical indifference claims against the various Defendants under numerous different Counts.  (*See* Am. Compl. ¶¶ 54-55, *id*. at 29-31, 42-43, 50-53.)

risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. "A medical need is serious, . . . if it is one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (internal quotations omitted). A serious medical need exists where "failure to treat can be expected to lead to substantial and unnecessary suffering." *Colburn v. Upper Darby Township*, 946 F.2d 1017, 1023 (3d Cir. 1991).

Deliberate indifference is properly alleged "where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999); *see also Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017) (*per curiam*) (deliberate indifference can be shown by a prison official "intentionally denying or delaying access to medical care or interfering with the treatment once prescribed" (internal citations and quotations omitted)). Not every complaint of inadequate prison medical care rises to the level of deliberate indifference. *Anderson v. Price*, No. 22-3058, 2023 WL 5814664, at *2 (3d Cir. Sept. 8, 2023). Allegations of medical malpractice, negligence, and mere disagreement regarding proper medical treatment are insufficient to establish a constitutional violation. *See Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004); *Hayes v. Gilmore*, 802 F. App'x 84, 88 (3d Cir. 2020) (*per curiam*). "Where a prisoner has received some amount of medical treatment, it is difficult to establish deliberate indifference, because prison officials are afforded considerable latitude in the diagnosis and treatment of prisoners." *Palakovic v. Wetzel*, 854 F.3d 209, 227 (3d Cir. 2017) (citing *Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993)). Nonetheless, "prison officials may not, with deliberate

13

indifference to the serious medical needs of the inmate, opt for 'an easier and less efficacious treatment' of the inmate's condition." *Id.* at 228 (quoting *West v. Keve*, 571 F.3d 158, 162 (3d Cir. 1978)).

The County Defendants move to dismiss Diggs's deliberate medical indifference claim against the County employees. They assert that when he overdosed on January 20, 2023, and thus presented a serious medical need, no Defendant was deliberately indifferent to his needs. (ECF No. 44-1 at 10.) Instead, Defendant Hickmon called in a medical code, PrimeCare nurses promptly administered two doses of Narcan, and Diggs was transported to Doylestown Hospital, where he received life-saving medical care. (*Id.*) However, for reasons discussed below, Diggs alleges a plausible deliberate medical indifference claim against the individual Defendants.

### a.    Serious Medical Need

The County Defendants take the position that Diggs did not experience a serious medical need until he overdosed. But the factual allegations in the Amended Complaint indicate that his serious medical need arose much earlier. On the morning of January 16, 2023, Diggs alleges he told Defendants McLeod, Onisick, Gorman, and Naftulin that he had ingested several drugs wrapped in plastic bags, including fentanyl and K2, and that he was suffering "excruciating abdominal pain."[11] (Am. Compl. ¶¶ 21-26.) Diggs alleges that Defendant McLeod acknowledged the threat that the drugs posed to his health and safety, stating that Diggs "had to know that he could die by putting drugs, especially fentanyl, in his body." (*Id*. ¶ 29.) Indeed, Diggs alleges that

---

[11] Diggs alleges that his claim of having ingested a large amount of drugs was confirmed by a urine test on January 16, 2023, which read positive for fentanyl, methamphetamine, barbiturates, amphetamines, and marijuana, (Am. Compl. ¶ 4), as well as by his excretion the next day of "a large amount of assorted drugs through a bowel movement." (*Id*. ¶ 30.) Thus, Diggs alleges that the Defendants were aware of the type and quantity of drugs that were in his system.

he nearly died from the delay in providing him medical care[12] and that he now suffers from PTSD, brain damage, and both short-term and long-term memory loss.  These allegations indicate that he suffered a serious medical need.  *See Monmouth Cnty. Corr. Inst*., 834 F.2d at 347 ("[W]here denial or delay causes an inmate to suffer a life-long handicap or permanent loss, the medical need is considered serious.").

Even if ingesting drug balloons did not pose a risk to Diggs's life, he alleges that he reported increasingly severe pain that by itself presented a serious medical need.  (*See, e.g.*, Am. Compl. ¶¶ 32, 36-40, 47-50; *id*. at 27-28) (describing his pain to the Defendants multiple times as "severe" or "excruciating"); *see Pearson v. Prison Health Serv.*, 348 F. App'x 722, 725 (3d Cir. Oct. 16, 2009) (*per curiam*) (finding that inmate stated Eighth Amendment deliberate medical indifference claim where, *inter alia*, "he complained of constant and excruciating pain to two nurses but . . . they provided no examination or treatment and merely put him on the sick-call list for the following day"); *see also Colburn*, 946 F.2d at 1023 (holding that a serious medical need exists where "failure to treat can be expected to lead to substantial and unnecessary suffering."). Moreover, a fair reading of the complaint suggests that Diggs's serious medical need was "so obvious that a lay person would easily recognize the necessity" for some form of medical treatment.  *See Cyr v. Schuylkill Cnty.*, No. 22-453, 2023 WL 1107879, at *3 (M.D. Pa. Jan. 30, 2023) (quoting *Monmouth Cnty. Corr. Inst.*, 834 F.2d at 347)); *see also Thomas v. City of Harrisburg*, 88 F.4th 275, 285 (3d Cir. 2023) (holding it is "obvious" that "when an officer is aware of the oral ingestion of narcotics by an arrestee under circumstances suggesting the amount consumed was sufficiently large that it posed a substantial risk to health or a risk of death, that

---

[12] The attached medical report from Doylestown Hospital states that Diggs arrived at the hospital in "critical condition."  (Am. Compl. at 71.)

officer must take reasonable steps to render medical care."). Diggs alleges he ingested drugs in an amount that several Defendants recognized was dangerous and potentially deadly, thus the need for medical attention was "obvious" for purposes of the deliberate indifference analysis. Diggs's Amended Complaint therefore alleges that he presented an objectively serious medical need shortly after ingesting the drug balloons on January 16, 2023.

### b.        Deliberate Indifference

Diggs's allegations also satisfy the second prong of the deliberate medical indifference analysis. They indicate that after Diggs admitted to ingesting the drug balloons, each of the individual Defendants[13] was aware that his medical needs were serious. He alleges that these Defendants were advised in administrative briefings that he had ingested a large amount of drugs, including fentanyl, the same drugs that had killed his cellmate, and that the drugs were still in his body. (Am. Compl. ¶ 50.) Moreover, Diggs informed each of these Defendants that he had ingested dangerous drugs, that he was in pain, and that he was afraid the drug balloons would burst and kill him. (*See id*. ¶¶ 32, 36-40, 47-50; *id*. at 27-28.) Certain Defendants explicitly acknowledged that Diggs's condition could be life-threatening. For example, Defendant McLeod told Diggs that "he had to know that he could die by putting drugs, especially fentanyl, in his body." (*Id*. ¶ 29.) Similarly, Defendant Williams told him, "the whole medical department, administration, and every officer in and out of this unit knows you got drugs in your body and that you could die from them like your bunkie." (*Id*. ¶ 34.) Diggs alleges Officer John Doe #4 told him that he, "was told not to call medical unless he thinks [Diggs] is dead." (*Id*. ¶ 37.) Nurse Jane

---

[13] Specifically, the nurses, the investigators who questioned Diggs regarding the death of Octavious Davis, and the correctional staff responsible for monitoring him in the RHU.

Doe #1 commented to the officer monitoring Diggs that "if [he] is not dead yet, it is presumed that he is alright." (*Id*. ¶ 47.)

Even if not all of the Defendants believed Diggs's life was in danger, he alleges that he advised each of the Defendants he interacted with in the RHU that he was in "serious" or "excruciating" pain. (*See, e.g.*, Am. Compl. ¶¶ 32, 36-40, 47-50; *id*. at 27-28). Thus, Diggs alleges that each of these Defendants was aware of his serious medical needs, but that they provided no medical care or examination for nearly four days, until he overdosed on January 20, 2023. It follows that Diggs has alleged that these Defendants were deliberately indifferent to his serious medical needs during that time.[14] Accordingly, the County Defendants' Motion to Dismiss Diggs's denial of medical care claim will be denied.

### 5.    Conditions of Confinement Claim

Next, Diggs alleges that he was subject to unconstitutional conditions of confinement during his four-day detention in the RHU. To establish a basis for a Fourteenth Amendment violation, a prisoner must allege that his conditions of confinement amount to punishment. *Bell v. Wolfish*, 441 U.S. 520, 538 (1979). "Unconstitutional punishment typically includes both objective and subjective components." *Stevenson v. Carroll*, 495 F.3d 62, 68 (3d Cir. 2007). "[T]he objective component requires an inquiry into whether the deprivation was sufficiently serious and the subjective component asks whether the officials acted with a sufficiently culpable state of mind." *Id.* (internal quotations and alterations omitted).

---

[14] Non-medical prison officials are not liable for deliberate medical indifference "absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004). Here, because Diggs alleges that he received no medical treatment or examination whatsoever, and alleges that the correctional staff were aware of it, he asserts a basis for liability against the correctional Defendants.

17

In that regard, "a 'particular measure amounts to punishment when there is a showing of express intent to punish on the part of detention facility officials, when the restriction or condition is not rationally related to a legitimate non-punitive government purpose, or when the restriction is excessive in light of that purpose.'" *Bistrian v. Levi*, 696 F.3d 352, 373 (3d Cir. 2012) (quoting *Stevenson*, 495 F.3d at 68); *Steele v. Cicchi*, 855 F.3d 494, 504 (3d Cir. 2017)), *abrogation on other grounds recognized by Fisher*, 115 F.4th 197.  Courts should consider the totality of the circumstances in evaluating such a claim. *Stevenson v. Carroll*, 495 F.3d 62, 68 (3d Cir. 2007) ("In evaluating a pretrial detainee's claim of unconstitutional punishment, courts must examine the totality of the circumstances within the institution.").  Furthermore, "[i]n determining whether restrictions or conditions are reasonably related to the Government's interest in maintaining security and order and operating the institution in a manageable fashion," courts are obligated to keep in mind that "such considerations are peculiarly within the province and professional expertise of corrections officials . . . ." *Stevenson*, 495 F.3d at 68 n.3.

Diggs alleges that for four days he was denied running water, drinking water, medical care, and "was forced to endure the stench of urine and feces that had piled up in and around the toilet over a four day period . . . freezing cold air blowing on him in the cell, poor ventilation, a soiled mattress to sleep on, and one dirty mildewed and pissy smelling blanket." (Am. Compl. ¶ 39.)  He alleges that he was denied sheets or a pillow and subjected to "constant illumination from cell lights being on 24 hours a day . . . all while experiencing pain from the drugs (heroin, fentanyl) withdrawal[.]"  (*Id*.)  The County Defendants contend that these conditions of confinement are justified by the legitimate penological objectives of ensuring Diggs's safety and the security of the institution.  (ECF No. 44-1 at 11.)  The Third Circuit has held that certain conditions of a dry cell, including lack of running water or loose bedding, are warranted by the need to prevent the

destruction of contraband or self-harm by an inmate. *Thomas v. Tice*, 948 F.3d 133, 137 (3d Cir. 2020). However, these conditions must not be "foul or inhuman" and must be warranted by some penological justification. *Id.*

Diggs alleges that he was denied drinking water for four days despite "begging" for it from the Defendants who came by his cell. (Am. Compl. at 21.) Potable water is a basic human need and the denial of it for even one day with no penological justification can allege a plausible constitutional claim. *See Harden v. Neal*, No. 25-4976, 2025 WL 2845370, at *4 (E.D. Pa. Oct. 6, 2025) (denying pretrial detainee drinking water for approximately 24 hours constituted a condition of confinement amounting to punishment); *see also Wolfe v. Christie*, No. 10-2083, 2013 WL 3223625, at *5 (D.N.J. June 25, 2013) ("[T]here is no doubt that potable water constitutes a basic human need."); *Chavarriaga*, 806 F.3d at 220, 228-29 (holding that a complete lack of potable water for three days "other than the water in a toilet bowl . . . poses a clear substantial risk of serious harm to an inmate" and that inmate who did not have water in her cell and who was told to drink from the toilet bowl when she requested water stated an Eighth Amendment claim (quotations omitted)). The County Defendants do not cite any legitimate penological reason for denying Diggs drinking water, particularly given that it appears contrary to the purported goal of having him pass the drugs from his body. (*Id*. ¶ 46.) Because Diggs alleges that at least some of the conditions in his dry cell were "foul or inhuman" and were not justified by any legitimate penological objective, his Fourteenth Amendment claim will proceed to discovery.[15]

---

[15] Diggs's allegations also state a claim if analyzed under the Eighth Amendment. To state an Eighth Amendment conditions of confinement claim, a prisoner must allege that prison officials' acts or omissions denied him "the minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981); *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 256 (3d Cir. 2010) (stating that the Eighth Amendment's prohibition of cruel and unusual punishment requires that prison officials provide "humane conditions of confinement."). Because

19

####        6.        Conspiracy Claims

Diggs alleges a § 1983 conspiracy claim, asserting that the non-medical Defendants "conspired to weaponize" BCCF's "potty watch" policy to violate his constitutional rights.  (Am. Compl. ¶ 56.)  The elements of a § 1983 claim of conspiracy to violate federal civil rights are that "(1) two or more persons conspire to deprive any person of [constitutional rights]; (2) one or more of the conspirators performs . . . any overt act in furtherance of the conspiracy; and (3) that overt act injures the plaintiff in his person or property or deprives the plaintiff of any right or privilege of a citizen of the United States," with the added gloss under § 1983 that "the conspirators act 'under the color of state law.'"  *Jutrowski v. Township of Riverdale*, 904 F.3d 280, 294 (3d Cir. 2018) (quoting *Barnes Found. v. Township of Lower Merion*, 242 F.3d 151, 162 (3d Cir. 2001)). However, "to properly plead an unconstitutional conspiracy, a plaintiff must assert facts from which a conspiratorial agreement can be inferred."  *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 178 (3d Cir. 2010) (citations omitted).  "[A] bare assertion of conspiracy will not suffice."  *Twombly*, 550 U.S. at 556.

Diggs asserts that the Defendants who monitored him in the RHU engaged in a conspiracy to "deprive [him] of his right to be free from cruel and unusual punishment, under the guise of being subordinate to a supervisor and BCCF Policy/Custom "contraband potty watch."[16]  (Am. Compl. ¶ 46.)  He alleges that the non-medical Defendants:

> . . . knew or should have known of [his] serious medical condition . . . and they refused to contact medical personnel at all.  They all gave blame to their superior for their inaction.  They failed to take reasonable action, and by being in agreement with other named

Diggs alleges that prison officials denied him drinking water, one of life's necessities, his claim is plausible whether analyzed under either the Fourteenth or the Eighth Amendment.

[16] The County Defendants do not address the conspiracy claim in their briefing.  (*See* ECF No. 44.)

20

> defendants about the course of action taken because of BCCF
> Policy/Custom "Contraband Potty Watch," they conspired to
> weaponize this policy/practice for four (4) days, while plaintiff
> suffered physically, mentally, and psychologically . . .

(*Id.* ¶ 56.)  To demonstrate the existence of a conspiratorial agreement, a plaintiff's allegations must show the parties "somehow reached an understanding to deny [an individual] his rights under § 1983."  *Kost v. Kozakiewicz*, 1 F.3d 176, 185 (3d Cir. 1993); *see also Ashton v. City of Uniontown*, 459 F. App'x 185, 191 (3d Cir. 2012) (stating an "inference of an agreement" among co-conspirators must "arise[ ] from the facts").  "In the absence of direct proof, such an agreement can be inferred from circumstantial evidence, such as evidence demonstrating that the alleged conspirators 'did or said something . . . to create an understanding,' 'the approximate time when the agreement was made, the specific parties to the agreement[,] the period of the conspiracy, or the object of the conspiracy.'" *Graham v. New Jersey*, 2022 WL 4010856, at *14 (D.N.J. Sept. 2, 2022) (alteration in original) (quoting *Great W. Mining & Min. Co. v. Fox Rothschild LLP*, 615 F.3d 159, 178-79 (3d Cir. 2010)).  Read liberally, Diggs alleges that the medical and correctional staff who monitored him in the RHU came to an agreement that they would deny him medical care unless his condition became critical, in violation of his constitutional rights.  This is reflected in the alleged comments of various Defendants, such as Nurse Jane Doe #1, who stated to an unspecified officer, "if [Diggs] is not dead yet, it is presumed that he is alright." (*Id.* ¶ 47.)  Diggs similarly alleges that Officer Williams told him, "the whole medical department, administration and every officer in and out of this Unit knows that you got drugs in your body and that you could die from them like your bunkie.  The nurses . . . know you should be taken to the hospital.  It's obvious that nobody care about your life." (*Id.* ¶ 34.)  Other Defendants echoed this apparent understanding that short of an overdose, Diggs would receive no medical care while in the RHU. (*See id.* ¶¶ 36-40.)  Although Diggs does not allege specifically when or where the agreement was

made, he alleges the individuals involved (the medical and correctional staff assigned to the RHU), the scope of the agreement (the duration of his detention in the RHU), and the object of the conspiracy (to make Diggs suffer and deny him necessary medical care), which is sufficient to allege circumstantial evidence of a conspiracy. *See Graham*, 2022 WL 4010856, at *14. Viewed in the light most favorable to Diggs, these facts plausibly suggest a conspiracy to violate his constitutional right to adequate medical care and his claim will therefore proceed to discovery.

### 7.    Excessive Use of Force

Diggs alleges that Defendants Hernandez, Officer John Doe #7, and Sgt. John Doe #7 "used excessive force to physically and verbally assault and abuse [him]" in his cell between January 16 and January 20, 2023. (*Id.* ¶ 31.) Excessive force claims brought by convicted prisoners are analyzed under the Eighth Amendment's Cruel and Unusual Punishment Clause, while claims brought by pretrial detainees are analyzed under the Fourteenth Amendment's Due Process Clause. *See Kingsley v. Hendrickson*, 576 U.S. 389, 400-01 (2015); *Jacobs v. Cumberland County*, 8 F.4th 187, 193-94 (3d Cir. 2021). The distinction is significant because the "language of the two Clauses differs, and the nature of the claims often differs." *Kingsley*, 576 U.S. at 400. When a convicted prisoner brings an Eighth Amendment excessive force claim against a prison official, the court must consider "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillan*, 503 U.S. 1, 7 (1992). The malicious-and-sadistic standard for an Eighth Amendment claim is subjective, but an objective standard is applied to a Fourteenth Amendment claim. *See Kingsley*, 576 U.S. at 400 (explaining that the reason for the lesser standard in a Fourteenth Amendment claim is that "pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically'");

*Jacobs*, 8 F.4th at 194 ("In 2015, the Supreme Court clarified that the subjective Eighth Amendment standard does not apply to pretrial detainees.").

For a pretrial detainee to state a due process violation based on excessive force, he must allege plausibly that "that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley*, 576 U.S. at 396-97. The following circumstances "may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.* at 397. Whether unreasonable force has been used against a detainee "requires 'careful attention to the facts and circumstances of each particular case.'" *Jacobs*, 8 F.4th at 194 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Courts should analyze "these circumstances 'from the perspective of a reasonable officer on the scene'" while keeping in mind that decisions about safety and order require the expertise of correctional officers, "who must have substantial discretion to devise reasonable solutions to the problems they face." *Id.* at 195 (quoting *Kingsley*, 576 U.S. at 397 & 399).

The County Defendants contend that Diggs "alleges in conclusory fashion that correctional staff verbally abused him and that he was physically assaulted while in a weakened condition." (ECF No. 44-1 at 7.) In fact, Diggs's allegations are supported by a detailed affidavit submitted by a fellow BCCF inmate, David McCloskey, which the County Defendants do not address. McCloskey avers that he was held in the RHU cell next to Diggs during the relevant time period and witnessed the alleged abuse by Officer Hernandez, an unnamed lieutenant or sergeant, and possibly another officer. (Am. Compl. at 70.) McCloskey states, *inter alia*:

23

> when Mr. Diggs was in the RHU in the cell next to me, I witnessed the officers run into the cell Mr. Diggs was in and I seen them assault him badly. I heard Mr. Diggs yelling and screaming and he was yelling "my arm[!]" then he started to cry. I heard numerous loud slams as if they were slamming him around and punching him.

(*Id.*) McCloskey alleges he heard Defendant Hernandez shout, "You killed that guy, you get no sympathy from me scumbag." (*Id.*) He states that the supervising officer ordered Hernandez to calm down and had to force him out of Diggs's cell. (*Id.*) Neither Diggs nor McCloskey alleges any facts indicating that Diggs presented a security threat or that he was resisting orders. The extent of Diggs's injuries is unclear, but McCloskey avers that the officers used sufficient force on Diggs to cause him to cry out and slammed his body hard enough that it was audible in the next cell over. (*Id.*) These facts suggest that the force used by the Defendants was unreasonable. And the alleged comment by Officer Hernandez indicates that he used force to cause Diggs harm rather than to restore or maintain order. The County Defendants claim that Diggs's allegations are "conclusory," however the Amended Complaint provides the basic facts regarding the alleged use of force incident necessary to allege a plausible Fourteenth Amendment excessive use of force claim, and it will therefore proceed to discovery.[17] *See Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (a civil rights complaint is "adequate" if it states " the conduct, time, place, and persons responsible."); *see also Sturgis v. City of Philaelphia* [sic], No. 23-4409, 2024 WL 1604597, at *4 (E.D. Pa. Apr. 11, 2024) (denying motion to dismiss where plaintiff provided "specific allegations that the . . . Defendants participated in the wrongful conduct at issue . . . [including] the particulars of conduct, time, place, and persons responsible[.]").

---

[17] These allegations, indicating that the officers used force far in excess of any need to maintain or restore order, also rise to the level of a plausible Eighth Amendment claim.

### 8.    Qualified Immunity

The County Defendants assert that, in the alternative, the claims against them should be dismissed because they are entitled to qualified immunity.  "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  To determine whether an official is entitled to qualified immunity, a court must consider whether the plaintiff's factual allegations "make out a violation of a constitutional right" that was "clearly established" at the time of the alleged misconduct.  *Id.* at 232.  To be "clearly established," a legal principle must be dictated by controlling authority such that "every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply."  *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018).  Application of this standard requires a high degree of specificity, in that "[t]he rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'"  *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).  "[A] case directly on point [is not required], but existing precedent must have placed the statutory or constitutional question beyond debate."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).  "The 'ultimate question' in the qualified immunity analysis 'is whether the defendant had fair warning that his conduct deprived his victim of a constitutional right.'"  *Williams v. Sec'y Pa. Dep't of Corr.*, 117 F.4th 503, 515 (3d Cir. 2024) (quoting *Schneyder v. Smith*, 653 F.3d 313, 329 (3d Cir. 2011)).

The United States Court of Appeals for the Third Circuit has noted that "the imperative to decide qualified immunity issues early in the litigation is in tension with the reality that factual disputes often need to be resolved before determining whether the defendant's conduct violated a

25

clearly established constitutional right." *Curley v. Klem*, 298 F.3d 271, 278 (3d Cir. 2002). Resolving the question of immunity may be a fact-intensive inquiry that requires a careful examination of the record, including a detailed factual analysis of the actions of each individual defendant. *See Grant v. City of Pittsburgh*, 98 F.3d 116, 122 (3d Cir. 1996). In many instances, the standard of review for a Rule 12(b)(6) motion favors denying qualified immunity. *See Kulwicki v. Dawson*, 969 F.2d 1454, 1462 (3d Cir. 1992) (contrasting the standards for evaluating motions to dismiss and for summary judgment and noting that "the standard of review under Rule 12(b)(6) is more favorable to plaintiffs seeking to circumvent official immunity"); *see also Fogle v. Sokol*, 957 F.3d 148, 162 n.14 (3d Cir. 2020) ("Courts should be mindful that where the allegations in a complaint do not require a more definite statement, immunity defenses will often require the benefit of discovery."); *Gruenke v. Seip*, 225 F.3d 290, 299-300 (3d Cir. 2000) (explaining that summary judgment is an appropriate stage at which to evaluate qualified immunity).

The Court declines to grant the County Defendants qualified immunity at this stage. Their briefing only addresses the first prong of the qualified immunity analysis, asserting that "none of [Diggs's] alleged violations are pleaded with sufficient factual support or adequate specificity" and therefore contend that they are entitled to qualified immunity. (ECF No. 44-1 at 16.) However, as discussed above, Diggs plausibly alleges multiple Fourteenth Amendment claims against the County Defendants, requiring an examination of the second prong of the qualified immunity analysis. Neither party has meaningfully briefed that step of the analysis. Diggs references *Thomas v. City of Harrisburg*, 88 F.4th 275, 285 (3d Cir. 2023), which suggests that a detainee's right to be afforded medical care after ingesting drugs *was* clearly established at the time of the events giving rise to his claims. However, given the lack of full briefing on the issue, no determination on the applicability of qualified immunity can be made at this stage of the

26

litigation. The County Defendants' motion will therefore be denied without prejudice and may be reasserted later if appropriate.

### 9. *Monell* Claims Against Bucks County and PrimeCare

Diggs seeks to present *Monell* claims against Bucks County and PrimeCare, alleging his constitutional injuries were caused by the County's and PrimeCare's respective policies and failure to train their staff. Local governments and municipalities are considered persons under § 1983. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). However, municipal liability cannot be predicated on a *respondeat superior* basis. *Id.* at 691. Rather, "under § 1983, local governments are responsible only for 'their own illegal acts.'" *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986) (emphasis in original)). There are two ways for a § 1983 claim against a municipality to proceed: "[a] plaintiff may put forth that an unconstitutional policy or custom of the municipality led to his or her injuries, or that they were caused by a failure or inadequacy by the municipality that reflects a deliberate or conscious choice." *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019) (internal quotations and citations omitted). "'Policy is made when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict.'" *Est. of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019) (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990)). "'Custom, on the other hand, can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law.'" *Id.* (quoting *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990)). For a custom to be the proximate cause of an injury, a plaintiff must establish that the defendant "had knowledge of similar unlawful conduct in the

past, failed to take precautions against future violations, and that its failure, at least in part, led to [plaintiff's] injury." *Id.* (internal quotations and alterations omitted).

Similarly, "a private health company providing services to inmates 'cannot be held responsible for the acts of its employees under a theory of *respondeat superior* or vicarious liability.'" *Sims v. Wexford Health Sources*, 635 F. App'x 16, 20 (3d Cir. 2015) (*per curiam*) (quoting *Natale v. Camden County Corr. Facility*, 318 F.3d 575, 583 (3d Cir. 2003)). Rather, to hold a private healthcare company like PrimeCare liable for a constitutional violation under § 1983, a plaintiff must allege the provider had "a relevant . . . policy or custom, and that the policy caused the constitutional violation [he] allege[s]." *Natale*, 318 F.3d 575, 583-84 (citing *Bd. of the Cnty. Comm'rs of Bryan Cnty., Oklahoma v. Brown*, 520 U.S. 397, 404 (1997)); *see also Lomax v. City of Philadelphia*, No. 13-1078, 2017 WL 1177095, at *3 (E.D. Pa. Mar. 29, 2017) ("Because [defendant] is a private company contracted by a prison to provide health care for inmates, . . . it can only be held liable for constitutional violations if it has a custom or policy exhibiting deliberate indifference to a prisoner's serious medical needs.") (citations and quotations omitted).

To allege municipal liability based on a failure to train, a plaintiff must plead facts showing "that said failure amounts to deliberate indifference to the constitutional rights of those affected." *Forrest*, 930 F.3d at 106. "This consists of a showing as to whether (1) municipal policymakers know that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Id.* In this context, the plaintiff must allege that the inadequacy in the training actually caused the constitutional violation at issue. *City of Canton*, 489 U.S. at 388; *Carson*, 2024 WL 3792223, at *7. Usually, "a pattern of similar constitutional violations by untrained employees is necessary to demonstrate deliberate

28

indifference for purposes of failure to train." *Thomas v. Cumberland County*, 749 F.3d 217, 223 (3d Cir. 2014) (citation omitted). In the context of a contract medical provider, the provider's "failure to train or supervise must amount to a policy or custom in disregard of an obvious risk that its employees or agents would commit constitutional violations." *Ponzini v. PrimeCare Med., Inc.*, 269 F. Supp. 3d 444, 526 (M.D. Pa. 2017), *aff'd in part, vacated in part on other grounds sub nom. Ponzini v. Monroe Cnty.*, 789 F. App'x 313 (3d Cir. 2019).

### a.   Bucks County

The County Defendants argue that Diggs has failed to state a *Monell* claim because he fails to allege that his injuries were caused by any County policy. They contend that he "does not identify any policy or custom that hindered access to [medical] treatment" and moreover, BCCF's contraband "potty watch" policy is rationally related to the legitimate penological objectives of (1) ensuring the safety of the inmate being monitored; and (2) preventing dangerous contraband from circulating within the facility. (ECF No. 44-1 at 17.)

Diggs does, however, allege facts indicating that BCCF's "contraband potty watch" policy was the moving force behind his constitutional injuries. He alleges that the policy "mandat[ed] that [Diggs] receive no drinking water for four days . . . [and] that under no circumstances [could Diggs] leave the cell without excreting all of the suspected drugs." (Am. Compl. at 28.) He contends that the policy "is employed on a blanket basis regardless of the individual's serious medical need or circumstance . . . and does not account for an inmate who admits that he has dangerous drugs inside of his body cavity" and needs emergency medical care.[18] (*Id*. ¶ 12.) In other words, Diggs asserts that the lack of any provision in the "potty watch" policy for situations

---

[18] Diggs asserts a separate cause of action for "Failure to Adopt Needed Policy" (Am. Compl. at 41-42), which is based on the same allegations and is therefore subsumed within his *Monell* claim.

like his, where an inmate requires emergency medical care to remove dangerous drugs from his body, caused his constitutional injuries.[19]  He alleges that numerous correctional and medical staff denied him medical care based on the "potty watch" policy, resulting in his eventual overdose. (*See id*. ¶¶ 11-13, 32-40.)  He therefore plausibly alleges a causal connection between the County's policy and his injuries.

The County argues that the contraband policy is justified by the legitimate governmental objectives of inmate safety and security of the institution. (ECF No. 44-1 at 17).  However, the County provides no justification for the policy's alleged requirement that inmates remain in a dry cell until they have excreted the contraband, with no exceptions for situations where an inmate's ingestion of the contraband presents a serious medical need.  Read liberally, Diggs asserts that this aspect of the policy caused his constitutional injuries and is not justified by any legitimate governmental objective.  (*See* Am. Compl. at 29) ("There was no penological justification to keep plaintiff in that cell when he specifically informed the BCCF and the officers that he still had lethal drugs . . . within his body cavity[.]")  Accepting all inferences in Diggs's favor, he alleges that the policy is not rationally related to a legitimate penological objective and therefore asserts a plausible policy-based claim against Bucks County.[20]

Diggs also alleges a claim against the County based on a failure to train theory.  In support of this claim, Diggs asserts that:

---

[19] Diggs acknowledges that under BCCF policy, "when it is known that an inmate has ingested or consumed narcotics, which could cause serious harm or death to an inmate, emergency medical attention is to be secured for the inmate." (*Id*. ¶ 31.)  However, he contends that the "potty watch" policy itself lacked any exception for medical emergencies, which led to his injuries.

[20] Because Diggs alleges a plausible policy-based claim against Bucks County, his claim that BCCF Director David Kratz violated his constitutional rights by adopting the contraband "potty watch" policy, (*see* Am. Compl. ¶ 12; *id*. at 49), is also plausible and will proceed to discovery.

> [m]onitoring plaintiff was done by correctional officers who were not trained to recognize specific symptoms of opiate withdrawal. BCCF was arguably on notice of deficiencies in the medical monitoring at their facility after a series of deaths of patients with serious medical needs and a 2017 accreditation report noting deficiencies in the execution of the inmate monitoring policies.

(*Id*. at 28-29.)  He contends that the County was on notice that correctional officers' lack of training was likely to result in constitutional injuries like the ones Diggs suffered.  (*Id*. at 29.)  Diggs's assertions regarding prior incidents of defective medical monitoring at BCCF are vague and may not by themselves support a plausible failure to train claim.  However, in the alternative, Diggs argues that this single incident is sufficient to support a failure to train claim.  (*Id*.)  Indeed, "in certain situations, the need for training can be said to be so obvious, that failure to do so could properly be characterized as deliberate indifference to constitutional rights even without a pattern of constitutional violations."  *Wichterman v. City of Philadelphia*, No. 16-5796, 2017 WL 1374528, at *4 (E.D. Pa. Apr. 17, 2017) (quoting *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 223 (3d Cir. 2014)).  "Liability in single-incident cases depends on the likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights."  *Thomas*, 749 F.3d at 223-24.

Here, Diggs alleges that the officers monitoring him were untrained in recognizing the need for emergency medical care when an inmate ingests dangerous drugs, and that as a result, they failed to call for medical care until he had already overdosed.  (Am. Compl. at 36-37.)  Several courts in this circuit have found that similar allegations based on a single incident allege a plausible claim of failure to train.  *See Wichterman*, 2017 WL 1374528, at *4 ("At this stage, plaintiff's allegations with respect to the lack of training on monitoring and treating detainees on opiates are sufficient to state a *Monell* claim against the City based on a failure-to-train theory."); *Koukos v. Chester Cnty.*, No. 16-4602, 2017 WL 511634, at *11 (E.D. Pa. Feb. 7, 2017) ("[Plaintiff] has

identified a specific type of training that should have been provided to correctional officers—training to educate correctional officers on the symptoms of opiate withdrawal, the medical needs of individuals experiencing them and the appropriate course of action.  He has alleged a causal nexus to his injury—had officers been trained accordingly, they would have recognized Koukos's symptoms, known that he needed immediate medical attention and permitted him to obtain it (by submitting his medical request slips or allowing him to go to the infirmary."); *Trussell v. Monmouth Cnty.*, No. 24-0151, 2025 WL 914923, at *24 (D.N.J. Mar. 26, 2025) ("Even if these prior incidents are insufficient to constitute a pattern of constitutional violations, they raise a reasonable inference that Jennifer's fatal overdose 'was a 'highly predictable' consequence of the failure to train . . . for single-incident liability.'" (quoting *Thomas,* 749 F.3d at 224)).  Because Diggs alleges facts indicating that a failure to train the BCCF officers working in the RHU caused his overdose and resulting injuries, and that Bucks County officials should have been aware of the need for such training, his failure to train claim is plausible and will proceed to discovery.

### b.    PrimeCare

Diggs also alleges that PrimeCare policies and failure to train its nurses caused his constitutional injuries.  His allegations as to PrimeCare policies are somewhat contradictory.  He asserts that "PrimeCare Inc. had a Policy/Custom/Practice of not allowing an inmate who ingested drugs to be transferred to an outside hospital," and that the three PrimeCare nurses that interacted with Diggs in the RHU, "officially adopted and promulgated the policies/practices & customs of PrimeCare Inc. on January 17, 2023, January 18, 2023, January 19, 2023, up until plaintiff fell out (overdosed) & was rendered unconscious."  (*Id*. at 38.)  He essentially alleges that the conduct of three PrimeCare nurses over the course of these three days constituted a PrimeCare policy, practice or custom.  However, Diggs does not allege that the behavior of these three nurses between January

32

17-19, 2023 was reflective of a larger pattern of behavior that would constitute a custom.  *See Est. of Roman*, 914 F.3d at 798; *see also Katzenmoyer*, 158 F. Supp. 2d at 500.

Meanwhile, these allegations are in tension with Diggs's assertion that "PrimeCare Medical Inc. Policy/Procedure/Customs [require] . . . immediate emergency medical treatment . . . when it is known that an inmate/patient has consumed or ingested harmful narcotics/drugs which would/could cause significant injury or death."  (Am. Compl. ¶ 51.)  He also alleges that PrimeCare has adopted a policy regarding training of staff in emergency response skills, stating *inter alia*, "[i]t is imperative that correctional personnel be able to recognize medical emergency situations and know their responsibility in reporting them to the health care staff."  (*Id*. at 39.)  The policy "requires that 75% of all correctional staff be trained and certified" in emergency response and suicide prevention skills, with the goal that 100% of correctional staff be trained and certified.  (*Id*. at 39-40.)   Diggs makes the conclusory assertion that his injuries were caused by "[PrimeCare's] failure to train its nurses that were on duty during [his] entire stay on the RHU", (*id*. at 38), but does not allege that PrimeCare was on notice of any deficiency in their training, and he acknowledges that the company has adopted policies specifically designed to prevent the constitutional injury that he suffered.  Diggs does not otherwise allege in what way the company's policies caused his injuries.  Without more, Diggs fails to state a *Monell* claim against PrimeCare, and the company's Motion will be granted as to these claims.

### 10.    Claims Against Sgt. John Does

Diggs asserts claims against each of the Sergeants who supervised the RHU during the time he was held there.  He alleges that each of these six supervising officers[21] ordered the officers

---

[21] Diggs refers to these supervising officers as Sgt. John Doe #1, #2, #3, #4, #5, and #6. He alleges that Sgt. John Doe #7 was involved in excessive use of force against him, but does not allege that he directed subordinate officers to deny him medical care.

monitoring Diggs not to call for medical assistance. (*See* Am. Compl. 30; *id* at 27, 29-31). Liability under § 1983 cannot be predicated on a *respondeat superior* basis. *Chavarriaga*, 806 F.3d at 227; *Robinson v. Delbalso*, No. 22-2378, 2022 WL 17248100, at *2 (3d Cir. Nov. 28, 2022) (*per curiam*). However, a supervisor may be liable if he or she "'with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (quoting *Stoneking v. Bradford Area Sch. Dist.,* 882 F.2d 720, 725 (3d Cir.1989)) (alteration in original). Alternatively, "a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in the subordinate's unconstitutional conduct." *Chavarriaga*, 806 F.3d at 227. While Diggs's allegations as to these supervising officers are not highly detailed, he asserts that they were aware of Diggs's serious medical need through administrative briefings and internal reports and that they personally directed their subordinate officers not to call medical care for Diggs. (*See* Am. Compl. 30; *id* at 27, 29-31). This plausibly alleges that they were personally involved in the denial of his constitutional rights, and therefore Diggs's Fourteenth Amendment claims against these supervisory officers will proceed to discovery.

### B.    State Law Claims

#### 1.    Negligence

Diggs asserts negligence claims against the three PrimeCare Jane Doe nurses.[22] Diggs's pleading presents some ambiguity as to whether his claims against the three nurses are properly

---

[22] PrimeCare appears to construe Diggs as asserting a negligence or medical malpractice cause of action against the company. (*See* ECF No. 49-1 at 7-9.) However, the Court understands the Amended Complaint to assert a negligence cause of action against the three PrimeCare nurses

construed as sounding in ordinary negligence or medical malpractice, given that the Defendants are medical professionals. "A court must ask two fundamental questions in determining whether a claim sounds in ordinary negligence or medical malpractice: (1) whether the claim pertains to an action that occurred within the course of a professional relationship; and (2) whether the claim raises questions of medical judgment beyond the realm of common knowledge and experience." *Medley v. United States*, No. 15-1261, 2016 WL 3913575, at *6 (M.D. Pa. Apr. 6, 2016) (citing *Davis v. United States*, No. 07–0566, 2009 WL 890938, at *5 (M.D. Pa. Mar. 31, 2009)), *report and recommendation adopted*, 2016 WL 3908400 (M.D. Pa. July 19, 2016). When evidence is predicated "upon facts constituting medical treatment . . . involv[ing] diagnosis, care, and treatment by licensed professionals," the evidence "must be characterized as [evidence of] professional negligence." *Id*. (quoting *Ditch v. Waynesboro Hosp*., 917 A.2d 317, 322 (Pa. Super. Ct. 2007), aff'd, 609 Pa. 464, 17 A.3d 310 (2011).[23]

---

only, and not against PrimeCare itself. (*See* Am. Compl. 27, 31-33) (alleging that "[a]ll Defendant Primecare Nurses had a duty to provide plaintiff medical care and failed to do so" and that "Defendants Primecare Medical Inc. Nurse[s] Jane Doe #1, #2, and #3 were negligent in their duty of care for plaintiff's serious medical needs/condition . . ."). While Diggs appears to set forth a negligence cause of action in his opposition to PrimeCare's Motion, he does so by merely repackaging his *Monell* claims. (*See* ECF No. 58 at 11-18.) Thus, the Court deems Diggs's negligence claim against PrimeCare subsumed within the *Monell* claims.

[23] Until recently, the distinction between ordinary negligence and medical malpractice was important because the Pennsylvania Rules of Civil Procedure require a person asserting a medical malpractice claim to file a "certificate of merit" with respect to each defendant against whom he asserts professional malpractice claim. However, the United States Supreme Court has held that these types of state certificate requirements are inconsistent with Rule 8 of the Federal Rules of Civil Procedure, which only requires a short and plain statement of a claim. *Berk v. Choy*, No. 24-440, 2026 WL 135974, at *4 (U.S. Jan. 20, 2026) ("Delaware's affidavit requirement is at odds with Rule 8 because it demands more."). Accordingly, such certification requirements do not apply in federal court.[23] *Id*. at *7 ("Delaware's affidavit law does not apply in federal court."). This makes the distinction between a claim of ordinary negligence and medical malpractice less significant at the pleading stage since the elements for the two claims are largely the same. *See Ditch*, 917 A.2d at 322 (noting that "the basic elements of medical malpractice and ordinary negligence are the same, although medical malpractice has some distinguishing characteristics.").

Because Diggs's claims against the three PrimeCare nurses appear to be based on the outright denial of medical care, rather than "upon facts constituting medical treatment . . . involv[ing] diagnosis, care, and treatment by licensed professionals" the Court understands him to allege claims of ordinary negligence against these Defendants.  *See Medley*, 2016 WL 3913575, at *6 (noting that "[c]ourts of the Third Circuit, in limited circumstances, have recognized that certain acts or omissions by prison medical staff" including denial of access to medical care, can constitute a breach of an ordinary negligence duty (citing *Hill v. Lamanna*, No. 03–323, 2006 WL 2433773, at *9 (W.D. Pa. Aug. 18, 2006)), *report and recommendation adopted*, 2016 WL 3908400 (M.D. Pa. July 19, 2016). To state a claim of negligence under Pennsylvania law, a plaintiff must allege:  "(1) a duty or obligation recognized by law, requiring the actor to conform to a certain standard of conduct; (2) a failure to conform to the standard required; (3) a causal connection between the conduct and the resulting injury; and (4) actual loss or damage resulting to the interests of another."  *Vasquez v. Wingard*, 847 F. App'x 108, 111 (3d Cir. 2021) (quoting *Kleinknecht v. Gettysburg Coll.*, 989 F.2d 1360, 1366 (3d Cir. 1993).

As discussed above, Diggs alleges that three PrimeCare nurses were deliberately indifferent to his serious medical needs, because they failed to provide any medical care or examination during Diggs's four days in the RHU, despite knowing that he was in severe pain and had ingested a large quantity of drugs.  Because Diggs's negligence claims are based on the same conduct, and because deliberate indifference is a higher legal standard than negligence, Diggs alleges a plausible negligence cause of action against the three PrimeCare nurses that will proceed to discovery.

### 2.    Negligent Infliction of Emotional Distress

Diggs asserts a NIED claim against "all Defendants."  (Am. Compl. at 40.)  In order to assert a plausible claim for NIED under Pennsylvania law, a plaintiff must allege one of the following four scenarios: (1) that the defendant had a contractual or fiduciary duty toward him; (2) that the plaintiff suffered from a physical impact; (3) that the plaintiff was in a "zone of danger" and at risk of immediate physical injury; or (4) that the plaintiff had a contemporaneous perception of tortious injury to a close relative.  *Doe v. Phila. Cmty. Health Alternatives AIDS Task Force*, 745 A.2d 25, 27 (Pa. Super. Ct. 2000).  If a plaintiff can allege one of the above factual scenarios, he must also allege two additional factors: (1) an emotional disturbance and (2) a physical harm. *Kovalev v. Lidl US, LLC*, 647 F. Supp. 3d 319, 346-47 (E.D. Pa. 2022) (citations omitted).  To plead a plausible NIED claim, a plaintiff must allege the traditional elements of negligence, *i.e.*, that the defendant owed a duty of care to the plaintiff, the defendant breached that duty, the breach resulted in injury to the plaintiff, and the plaintiff suffered an actual loss or damage.  *Graziano v. Pa. Dep't of Corr.*, No. 22-163, 2023 WL 6389756, at *32 (W.D. Pa. Sept. 30, 2023).

Here, Diggs alleges a plausible claim of NIED against the individual Defendants who were personally involved in the events of January 16-20, 2023.  He alleges facts indicating that: (1) medical and correctional staff at BCCF have a duty to care for the health and safety of inmates; (2) these Defendants breached that duty by failing to provide him medical care when he was experiencing a serious medical need; (3) he suffered physical and emotional harm as a result, including overdosing, falling into a drug-induced coma for three days, and suffering PTSD, brain damage, and memory loss; and (4) the Defendants' negligence was the proximate cause of his harm.  Because Diggs alleges the elements of traditional negligence, along with an emotional

37

disturbance accompanied by physical harm, he asserts a plausible NIED claim.  *See Kovalev*, 647 F. Supp. 3d at 346-47.

### 3.  Intentional Infliction of Emotional Distress

Liberally construing the Amended Complaint, Diggs also alleges an IIED claim against the individual Defendants.  (Am. Compl. at 40.)  "To establish an IIED claim under Pennsylvania law, a plaintiff must [allege] that (1) the defendant's conduct was extreme or outrageous; (2) the conduct was intentional or reckless; (3) the conduct caused emotional distress; and (4) the plaintiff's distress is severe."  *Doe v. The Trustees of the Univ. of Pa.*, 270 F. Supp. 3d 799, 826-27 (E.D. Pa. 2017).  The defendant's conduct must be "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized society.'"  *McGreevy v. Stroup*, 413 F.3d 359, 371 (3d Cir. 2005) (quoting Restatement (Second) of Torts § 46 cmt. d)).

Diggs alleges that for four days, he presented a painful and life-threatening medical condition, but that each of the medical and correctional staff responsible for his safety denied him any medical care until he overdosed.  "A medical provider may act intentionally and outrageously if it refuses 'outright . . . to provide medical care' to a prisoner."  *Kinney v. Cnty. of Berks*, No. 22-2566, 2023 WL 3868379, at *17 (E.D. Pa. June 6, 2023) (quoting *Charleston v. Corizon Health, Inc.*, 2018 WL 1757606, at *22 (E.D. Pa. Apr. 12, 2018)); *see also Adams v. Delaware Cnty.*, No. CV 23-1178, 2024 WL 4349950, at *12 (E.D. Pa. Sept. 30, 2024) ("We agree with other courts in this district that outright refusal to provide medical care may indicate extreme and outrageous conduct.").  Diggs alleges that as a result of the Defendants' conduct, he fell into a coma, suffered brain damage, and has short and long-term memory loss.  He also asserts facts indicating his emotional distress was severe, stating that after the Defendants refused his requests for medical

38

care, he "cried on several occasions, paced the cell wondering if these would be his last days alive, had abnormal heart rhythms, had panic attacks . . . and did not sleep for days on end, fearing that the [drug balloons] would burst and he would not ever wake up."  (Am. Compl. at 40.)  Diggs thus plausibly alleges claims for IIED against these Defendants, which will proceed to discovery.

### 4.      Governmental Immunity

The County Defendants argue that the individual County employees are entitled to governmental immunity from Diggs's state law claims, pursuant to the Pennsylvania Political Subdivision Tort Claims Act ("PSTCA"), 42 Pa. Cons. Stat. §§ 8541–8564.  (ECF No. 44-1 at 20.) Under the PSTCA, a local agency and its employees are granted immunity from tort liability,[24] with only a few narrow exceptions.  *See* 42 Pa. Cons. Stat. Ann. §§ 8541-50.  The Act provides that a local agency is excepted from "liabil[ity] for any damages on account of any injury to a person or property caused by the act of the local agency or an employee thereof."  42 Pa. Cons. Stat. § 8541.  The "defense of official immunity" applies to "[a]n employee of a local agency" sued in his or her individual capacity "only to the same extent as his employing local agency."  *Id*. § 8545; *Milbourne v. Baker*, No. 11-1866, 2012 WL 1889148, at *5 (E.D. Pa. May 23, 2012) ("With respect to plaintiff's individual-capacity claim . . . the [PSTCA] states that employees of a local agency are entitled to the same immunity as their employer.") (citing § 8545).  However, the Act does not shield an employee against personal capacity claims where the employee has engaged in "a crime, actual fraud, or willful misconduct."  *See* 42 Pa. Cons. Stat. § 8550.  The Third Circuit has explained that "'willful misconduct' is synonymous with the term 'intentional tort.'"  *Sanford*

---

[24] The Act defines a local agency to which the immunity provision applies as a "government unit other than the Commonwealth government."  *See* 42 Pa. Cons. Stat. § 8501. Bucks County falls within this definition.  The Amended Complaint reflects that the individual Defendants were acting in the scope of their employment during the events in question.

*v. Stiles*, 456 F.3d 298, 315 (3d Cir. 2006) (quoting *Renk v. City of Pittsburgh*, 641 A.2d 289, 293 (Pa. 1994)).

The County Defendants are entitled to immunity on Diggs's state law claims of negligence and NIED, which are barred by the PSTCA and are not subject to any statutory exception.[25] *See Lancie v. Giles*, 572 A.2d 827, 830 (Pa. Commw. Ct. 1990) ("The conduct in this case clearly does not fall in one of the exceptions and the [plaintiffs'] negligence counts must therefore fail"). However, because IIED is an intentional tort, the County Defendants are not entitled to governmental immunity on that claim. *Id. at* 830 ("Appellants are . . . not protected by governmental immunity with respect to the count of intentional infliction of emotional distress.") Accordingly, the negligence and NIED claims against the County Defendants will be dismissed.

## V.      CONCLUSION

For the foregoing reasons, PrimeCare's motion to dismiss will be granted in its entirety. The County Defendants' motion to dismiss will be granted with respect to Diggs's negligence and NIED claims against the County Defendants, and the claims against Defendants Carl Metellus, Jeffrey Cantino, Kelly Reed, Daniel Naftulin, Robert Gorman, James Coyne, and Captain Nottingham will also be dismissed.  The Motion will be denied in all other respects.  All surviving claims will proceed to discovery for further factual development.  Diggs's pending Motions for Appointment of Counsel (ECF Nos. 43, 62, 68) will be granted and his case referred to the Prisoner Civil Rights Panel of the Eastern District of Pennsylvania.  An Order follows, directing the remaining Defendants to respond to the Amended Complaint (ECF No. 29) in accordance with this Memorandum and Federal Rule of Civil Procedure 12(a)(4).

---

[25] This immunity does not, however, apply to employees of a prison medical contractor. *See Williams v. Syed*, 782 A.2d 1090, 1096 (Pa. Commw. Ct. 2001).  Thus, the negligence and NIED claims against the three PrimeCare nurses will proceed to discovery.